Case number 213396, Debra ODonnell et al. v. G Michele Yezzo et al. Argument not to exceed 15 minutes per side. Ms. Hyatt, you may proceed for the appellant. Good morning. Good morning, Your Honors. May it please the court. I'm Carolyn Hyatt and along with Algar Hartstein, we represent the plaintiffs in this case. I'd like to please reserve three minutes for referral. Very well. Plaintiffs have been denied the ability to litigate this case against a key defendant and as a result, this entire litigation has been hobbled from the start. Discovery has been limited both by the denial of the motion to compel and limitations placed on discovery by the district court based on the dismissal of claims. Most importantly, the dismissal of Defendant Yezzo. We know that Yezzo's reports were unverifiable junk science. We know that she had a reputation for fabrication in her own personnel file. And sadly, we know that she was tremendously unstable at the time and finally put on administrative leave after threatening violence against her coworkers. But despite all of this, she was still allowed to produce and testify to false and unverifiable opinions. She actually returned early from her administrative leave so that she could testify in Jim Parson's trial and that testimony led to his conviction and incarceration for 23 years. The dismissal of these plausible claims against Yezzo and her supervisors and the denial of full discovery has resulted in this case proceeding to summary judgment without key players still involved and without the benefit of all the facts. When you say full discovery, what exactly are you referring to again? It's a few things. So one of the issues directly at issue on the appeal is a motion to compel disclosure of the grand jury transcript, but it also includes other things. I guess, you know, just to deal with the grand jury. I'm really at a loss as to how a federal court would have the power to order a state court to reveal grand jury materials that are secret under state law. That is the situation we have here, right? That's... Yes, but that is not at issue in this appeal. The district court followed Sixth Circuit precedent, although I'm not remembering the name of the case right now, that said that in a case like this where the federal court is in a better position to understand the likelihood that there would be a particularized need for the grand jury transcripts, that they're the proper venue to make that determination. Is there a case where, do these cases that you're referring to, Sixth Circuit cases, are they, is there a case where we ordered a state court to produce grand jury materials because Douglas Oil, the Supreme Court case, was not that. Douglas Oil, grand jury materials held by the Central District of California Federal Court, Rule 6 of the Federal Rules of Criminal Procedure. There's no way that is talking about state grand jury materials in any respect. It's 100% about federal stuff. And so I, you know, it seems like the request to, I'm just telling you my concern, seems like you made the request to the wrong court. If you want state court grand jury materials, it would seem to me, you need to file some kind of petition there, not here. And I just want to give you a chance to respond and tell me where I'm wrong in that. Yeah, I think the most comparable case where this has of Ohio case is the Wheat case that we, that is in the briefs. That was similarly, I believe, a wrongful conviction case and the district court ordered disclosure of the grand jury transcripts. I'm not remembering the original. State or federal grand jury material? I believe it was state, but I don't remember off the top of my head. This was briefed to the district. Maybe they would get reversed for that. But I mean, so you're not aware of any Sixth Circuit case or any other circuit case in which a federal court presumed to order a state court to disclose grand jury material, which was secret. And that's a very big deal. Grand jury secrecy. That was secret under state law. I don't remember right now because that wasn't the basis of the appeal, but the district court considered that issue and ruled on it directly. Yeah, and that might have been a mistake too. But I mean, this is an extraordinary idea that we could order a state court. Is that what you're asking for? I thought the transcripts were already produced. They were available. They've already been reviewed by the district judge. I think the city already has them. I mean, is it necessary for us to compel a state court to do anything here or the transcripts already here? Plaintiffs have never had access to the transcripts. That's part of the issue. I recognize that. Well, the transcripts that were in the box mistakenly got given back to the state court, right? They have been given back to the state court. Yes. So for us to say that the district judge abused his discretion here after having looked at this grand jury testimony, which takes us out of the purview of all these other cases, as far as saying that the district judge had the power to and should order the state to turn over the grand jury transcript, correct? Yes. And I'm glad that you brought that up because I think it's important to understand why, even though the district court did review the grand jury transcripts, why that review and inspection was incomplete and why there is still a particularized need. So when this came to be, the plaintiffs asked for an in-camera inspection for the district court to look at this and specifically asked not only that the district court review and compare the grand jury testimony to the trial transcript, but also to the depositions, exhibits, and to Yeso's reports. And the district court declined to do that and said that it wanted to compare to the trial transcript and asked the parties to brief, do some supplemental briefing on what it should be comparing and to point stuff in the trial transcript. So plaintiffs, because we had asked for it to consider not just the trial transcript, but also the depositions and the reports included that as well. So where I'm going is that there is an example that shows why this would make a difference. If you're going to the depositions, I don't even understand that because you say the extraordinary need to look at the grand jury testimony is because you took depositions of the witnesses and because this happened so long ago, they don't remember. So there's not going to be anything in a deposition that's going to be useful. Well, there's some things they remember. What they don't remember is what they testified to at the grand jury. But for example, there's a dispute between White and Yeso as to the chemical analysis that she performed. So the problem with comparing, let's say Yeso's testimony and the grand jury to the trial testimony, is that when she testified at the grand jury, she had not conducted her chemical enhancement yet. She'd done the first report, but not the second. So if her testimony did match the trial testimony, then either her report or her testimony is false. Let's sort of cut to the chase here, at least. I think that's what this is doing. We're reviewing this decision on an abuse of discretion standard, are we not? Yes. So the district judge got the transcript. The district judge then reviewed the transcript, correctly or incorrectly, and decided that there was not a particularized need or extraordinary reason to turn it over to you. How can that possibly be an abuse of discretion? And if we were to say it was, what would we say the district judge was required to do that he didn't do? The limited inspection that the district court performed was inadequate to determine if there was relevant testimony that we have a particularized need to receive. So what would we say? We say that he should have considered both the things that you asked him to look at, and he should have read all the depositions and then made an independent determination as to whether there's anything contradictory to the grand jury testimony? He wouldn't need to have reviewed everything, because we did do that supplemental briefing. Plaintiffs pointed him to these exact issues. And he followed that. He did what you asked him to do. He did not. Oh, I see. We asked him to compare everything, and he entered the order on the basis that it was not inconsistent with or more elaborate than the trial testimony and only the trial testimony. Is there any case that even comes close to you, what your claim the district judge should have done that would show that in not doing it was an abuse of discretion? I don't know one where the same kind of circumstance came up now. I want to also talk about the the motion to dismiss specifically the fabrication claim against defendant Yezzo. Here, the district court erred in dismissing that claim because it focused on one sentence and ignored the rest of plaintiff's allegations. So it said that the allegation that she knowingly prepared false forensic evidence was merely a legal conclusion. However, that is just, I mean, for starters, that is a legal conclusion. Fair. You have to give facts, specific things that would allow one to make a plausible inference. Okay, good. I don't mean to interrupt you. Go ahead. But plaintiffs did plead various allegations that make that a acceptable factual inference that she did, in fact, yes. Okay, fabricate this evidence. It's pretty simple. You just got to read paragraphs 36 through 42 or 44, whatever it is. And if you read them as a whole, in your estimation, it's clear what the paragraph in question was referring to. Yes, I believe so. And those paragraphs do sound about accurate. Yeah, I think through 42. I think one of the key issues is that the complainant didn't only allege that she did a bad job, but that it did go beyond that and said, not only that she had this reputation for fabrication, that she was known to stretch the truth, to ask for what the evidence needed to say, and for giving law enforcement the answers they wanted if they stroked her ego, but also that she then acted consistently with that reputation by purposefully conducting this analysis in a way that it would be unverifiable and unchallengeable, because there's no documentation of what she found. There's just her testimony saying, I saw this evidence that no longer exists. Is that, so that, I mean, a lot of what you say here is not specific to this case, her opinions in this, you know, in the criminal case here, but that is, right? So is that, is that what you, because you have, there has to be an inference that in this case, not just that she did a bad job generally, but in this case, she knowingly gave a false report, and is that, is that kind of, is that all you rely on? I'm not saying it isn't enough. I just want to understand, is that the only case-specific thing that we have in these paragraphs? I think the combination of the analysis that was inconsistent with the standards of practice at the time, the lack of documentation, and the allegation that she purposefully performed it in that manner to be able to produce a report that would establish probable cause comes together, yes, to do that. Okay. And even if- I want to go on to talk about something else that bothers me in this case. One of your big complaints is that the Yazoo personnel file was not disclosed, right? You're claiming that's a Brady violation, but you're getting it in through the Due Process Clause. Do I understand that correctly? Well, in this case with these defendants, the information in the personnel file, yes, but not the file itself, because Yazoo and White weren't the holders of that file. All right. So I got that. I got that subtlety. So are you saying that if a witness testifies, could be a corrections officer, police officer, evidence technician, whatever it is, they have to come forward, presumably to the prosecutor, and say, hey, this is in my personnel file, you need to turn it over? Are you saying that's an obligation that is imposed upon witnesses? Not exactly. Okay. So if it's not exactly, what case do you have that says that is an obligation of a witness to affirmatively themselves turn over something that might or might not be impeaching by labeling it Brady? I'm trying to think which ones would be witnesses. There is a case where the fact that a witness was, I believe, under investigation and on administrative leave, was found to be exculpatory impeachment evidence. I'm not asking whether it's exculpatory or not. I'm asking you if the witness has the duty to turn that over to either the, in this case, the plaintiff, or to the attorney. So in the context of Yazoo and her obligation, when she testified at trial and testified that she was an expert and could opine on these things and didn't qualify that with the fact that she had expressed to her supervisors that she always got it wrong and didn't believe that she could continue to perform her job. I think that is. Wait, I'm not at the testimony phase. All I want to know is, is your proposition here that a witness has to disclose something negative about the witness that's in their personnel file before they testify? I think the reason why there is a yes or no, in this case, yes, because she was employed by the state. So where is that duty? Is there a case that that tells us witnesses they have that duty? Hey, I know something about what I did here that's in my personnel file and I need to tell the, in this case, the prosecutor. I don't have a case, but I think the way to think about that is not to look at her only as a witness, but as testifying on behalf of the state. So if there isn't a case, then it's not clearly established as a yazzo, right? Well, the district court didn't have any decision about whether things were clearly established. I'm asking you what proposition we're establishing here if we follow your route. So I'm not getting very far with you on whether the witness has a duty, which you can't cite where the source of that duty is. So now the fallback on that, which might be the answer, is that well, the witness doesn't have that duty, but the, in this case, the prosecutor has the duty to look at a witness's personnel file to see if there's something bad in there. That's part of your claim, right? Sure. So, well, that was the less confident answer I've ever heard. The prosecutor is a big issue in these claims before this court right now. So there's no dispute. So where do we look at to see that a prosecutor, before they call a witness, has a duty to look at their personnel file to see if there's something in there where they've been disciplined or something in the past. Is that an obligation that we impose upon a prosecutor? I mean, I believe so, but that hasn't been an issue in this because the prosecutor isn't. So you're not aware of a case for that either. I'm just trying to figure out where the duty is that somebody breached here in not looking at a personnel file, seeing some negative, arguably exculpatory evidence, and then turn it over. Okay, so one thing that might be useful is to turn to defendant White and the argument against him. So in that case, usually a police officer would have fulfilled the obligation to disclose once the prosecutor was aware. But there's this unusual factual situation that came up where the prosecutor reasonably became concerned about Yeso's credibility and went to White and relied on White's affirmative representations that this didn't affect her work and that she was credible. And him affirmatively doing that and preventing her lack of credibility from coming through. You could have just subpoenaed her personnel file, couldn't you? In the criminal trial proceedings? Well, you're right. We're back in the criminal trial here, not this case. I mean, I can't say what was or wasn't subpoenaed in the criminal trial at the time. But the court in the criminal proceedings when Mr. Parsons was exonerated found that that had not been turned over and that was the basis. Well, I understand that and I'm questioning that decision, even though I understand that's not what we're focusing on here today. All right. Thank you. Okay. I do see that I'm out of time. If you guys have any more questions right now, I can go ahead and do that. But if not, I guess I'll wait for my rebuttal. All right. Anything further? All right. You'll have your three minutes rebuttal. Good morning. Good morning. My name is John Rockenbach and I represent the State Defendants Yezzo, Cappy, and Lenhart. I'll be taking the first eight minutes of our shared block and counsel for the City Defendants will have the remaining seven minutes. Following the admonition of the court this morning, I will try to stick to the most pressing issues in this case and I'd like to begin with whether the original complaint stated a plausible claim for fabrication of evidence. As you heard my friend say, that just requires that we look at paragraphs 36 through 42 in the complaint and decide whether they plausibly state a claim. And so that's what I would like to do right now. And what you're going to see is definitely some troublesome allegations, but not allegations that make it plausible that Ms. Yezzo knowingly fabricated evidence, which under this court's decision in Mills is what is required. So paragraph 36 simply summarizes Yezzo's testimony at trial, what she said about her test and about the craftsman bar. You'll notice there's not even an allegation in this section that any of those tests or any of those statements were false, simply that they were unreliable. Paragraph 37 says that. Well, on that point 36, I mean, how is it that a recessed letter on the breaker bar would leave a mark? I mean, you know, one could read this to suggest that her testimony was obviously fabricated or was fabricated because how could that happen? How could she see an imprint from something that was a recess rather than a protrusion? So I'm not a scientist. I'm guessing that perhaps the blood could shape around the edge of the corners, and I don't think that there was a dispute as to the N being visible. It was mostly her testimony was mostly about the S. The complaint references that she submits it to other, or that Defendant White submitted it to other counties, they weren't able to conclusively tie it. But it was blood that was providing the outline? That's the idea here? That's my understanding. Okay, well, I can understand that. All right. So then in paragraph 37, we have allegations, one, that her methods were unreliable, and two, that she knew that they could not be verified. But again, no allegations that she produced knowingly false results. And then perhaps the most troublesome allegations in 38 and 39, we have her reputation for stretching the line, for producing evidence that the police officers wanted her, what needed for the particular case. But none of those are case specific, and they, again, do not allege specific false results that happened in this case. Then we have... Isn't 40 enough? Yazzo knowingly prepared false forensic evidence, and the false forensic evidence seems to me, logically speaking, is what the complaint is talking about in 36 to 39. Right. So 40 and 41 say she knowingly produced false forensic evidence and that she included some of that evidence in her report. But as Judge Kethledge noted, those allegations, I think, are clearly conclusory allegations, and Iqbal tells us that we don't look at those. Well, I mean, I understand that 40 and 41 standing alone probably are legal conclusions and aren't enough. But why isn't 40? That's what I'm asking you to focus on. Why isn't 40 enough when read in the context of 36 to 39? So 40 by itself is conclusory, and Mills tells us why it's not enough in the context of 36 through 39. Mills suggests that plaintiffs should identify specific false evidence and include allegations to help the court understand why those allegations are false, as well as allegations that show that it was knowingly done. Okay, but they've identified evidence, right? It's the breaker bar stuff, you know, the sheet and all that, right? I mean, 36 does identify some specific evidence, right? It identifies evidence, but there's no allegation in the complaint that ties those specific allegations with the general allegations together. Well, okay, but that's the next part. So, but the first part of what you said, I think one could say the complaint does that. It does identify some specific evidence. It summarizes her testimony, but it doesn't identify the second part. I think the other side might argue is that in paragraph 42 that she can does her work or conducts her analysis in a way that can't be reviewed or verified, you know, it's this like chemical stuff that she puts on there and then it disappears and we just have to take her word for it. And I think that is case-specific. Frankly, I think this is their best argument, so I'm giving you a chance to answer it. It is case-specific. You read it in light of all this other stuff. I mean, just because she does bad things in other cases doesn't mean she's done it here. But now they're saying, look, and is this a coincidence that her work is not reviewable here? No, it allows us to have an inference that this too is a bad, you know, bad report. What's your response? If a Daubert claim could form a 1983 claim, that would be a good argument, but that doesn't rise to level plausibility in terms of knowingly false as opposed to knowingly unreliable. That's a conclusory allegation. I'm just teasing you a little bit. Why? Why is it not plausible to say, okay, all this stuff together means the stuff in 36 was knowingly false? So I think the best answer to this comes from this Court's Mills decision and the other cases that we cited in the briefs, and we just require more specifics as to identifying specifically false statements and providing reasons why. Now, if possible, can I turn to— Daubert and Iqbal are basically a notice. They're notice cases. You say enough in a complaint that it's on notice and it's plausible, and what they're notifying them of is plausible. So I think if you were here making a Rule 56 argument, it would make a lot more sense, but this is Rule 12, right? Right. So why isn't this enough for Rule 12 and you go back and you all argue over Rule 56 when you're finished with your discovery? So, again, under this Court's decision in Mills, I think it's not enough as a matter of case law, but if I may transition to the amended complaint as a way of answering that question, the civil rules, in terms of guaranteeing notice, set out a mechanism for cases where the allegations just aren't quite enough and aren't quite specific enough. Rule 15a1 gives a 21-day period at which you can amend a complaint after a 12b6 that's specifically designed to remedy pleading defects that the motion to dismiss drafter identifies, and then there's a free leave given before the district court reaches its decision. So they had seven months in this case to shore up those allegations. Rule 15a1 only requires a leave to amend when justice freely requires. This Court's decision in Lever-Caviar, Leisure-Caviar tells us that justice does not so require. Can you really stand here after having read the complaint and tell me that in defending Yazzo, you didn't know what they were claiming she had falsified? Can you say that? Perhaps there's an inference as to what the false statements were, but there's no explanation in the complaint as to why the Court should believe that those are false, and under this Court's decision in Mills, I think that's what's required at the pleading stage. They had ample opportunity. Let me interrupt you again. I apologize. I was just flipping through your brief and I was looking at every citation you have for Mills because I didn't remember exactly what Mills said, and I don't see anything on the three pages of your brief where you cite Mills that really helps us on this. So what did Mills say specifically? Not the fact that you string-cited it, but what does Mills specifically say that helps us in this case? Right. So I want to step back at first and just concede that Mills is a case where they ultimately did find that the complaint passed Muster on 12B6, though it was a close call, but it walked through what was required for plausible statements as to avoid the charge that the allegation that intentional misrepresentation was conclusory, and in that case... All you cited Mills for was that there's four elements of that, and this case involves the fourth one. You don't then tie whatever else Mills says to this case. So I don't have a brief in front of us, but I believe that there's a portion of our brief where we cite Gregory and Henchman and Mills and Gavit to walk through what this court required. And in Mills... Okay, so it's a combination of four cases. All right. We'll go back and look at it again. You answered the question. Mr. Rockenbach, you're out of time, but I'll give you just a minute to summarize your position, if you want. So at the end of the day, we do not believe that this plausibly states a claim for fabrication, and the district court correctly applied the right standard with the leap to amend. If I may just quickly address the Brady claim that you guys talked about. As you mentioned, there's no cases out there, at least no cases out there before 1993, which is when this happened, saying that an investigator had an obligation to disclose their own self-impeachment evidence to the prosecutor Furthermore, as Judge Larson distilled this court's precedence in Spurgeville v. City of Newman concurrence, you need to allege deliberate concealment. There are no allegations of deliberate concealment in this complaint, and therefore the Brady claim fails as well. And I'll leave the other issues to our briefs. All right. Thank you very much. Good morning. Good morning, Your Honors. Byron Choke on behalf of Officer Michael White in the City of Norwalk. Before I get into my main argument, I did want to address Judge McKeague on the, does a witness have a duty to disclose their personnel file? And this court has already said in United States v. Driscoll, the I'm out to Brady material. There's got to be something more than to go out and get the personnel file of somebody who's involved in the case. I think that would apply to Yezzo's personnel file in this case. And also it's clear from the evidence, the record evidence that neither White nor Yezzo knew what was in that personnel file. Nobody ever made any claims against Yezzo regarding what her supervisors put in that personnel file, and she was even unaware of that fact. So, Mr. Rockenbach, I think sort of pivoted, or maybe it was the Plaintiff's Counsel, I don't remember, to say, well, maybe maybe it wasn't Yezzo's obligation, but it was White's obligation. White's your client, right? White is my client. That's correct, Your Honor. So White allegedly was in possession of information that she had a reputation and a history of stretching the truth. He didn't have that information, Your Honor. That was in the personnel file. The only information he had was that she was having employee issues with her fellow employees and that she went postal. And that's why she was put on administrative leave. He had no clue of those allegations in her personnel file that she would stretch the truth or that her work was affected by her employment issues. Those matters were within her personnel file, but neither White nor Yezzo were aware of those facts. Further, White had the same information the prosecutor had, that he in fact got the information about her employment issues from the prosecutor. The law is pretty clear that what his requirement, what his duty was, was to make sure that that information that he had was the same information that the prosecutor had. He did that in this case. Their claim that later on, the elected prosecutor asked him if any of these issues would have an effect on Yezzo's testimony. That question was not just asked of White. It was asked of White and the assistant prosecutor who was trying the case. And the assistant prosecutor who was trying the case was the one who said, no, this isn't going to affect our case. She can testify. So in that regard, I don't think there's any Brady violation whatsoever that can be shown against Officer White based upon that personnel file. The fabrication of evidence claim against White. Such a claim requires a showing that Officer White knowingly fabricated the evidence. The claim in this case is that he provided the wrong breaker bar. But there's no showing that he knowingly took a breaker bar that he knew was not part of this case and gave that for testing. It's very difficult for me to understand why he would even think to do such a thing or why he would think that that would help in prosecuting this case. The record shows that that particular breaker bar had the initials of the officer on it that took it from the guy that bought the car. That is correct, your honor. The record shows that the breaker bar that Officer White found in the evidence room when he reopened this case was tagged and marked as coming from Burris in Arizona back in 1981 by the investigating officer back then by the mailing and Strimple who were the two officers who went out to retrieve the bar, placed it in a bag, marked the bag, marked the bar. That's the one that Officer White retrieved from the evidence room when he reopened the case. That's the one that he handled throughout the Miss Yeso for testing. That's the one that went to the jury and that was during the criminal trial and the defense at the criminal trial strongly, strongly argued that that was the wrong bar. They presented three additional bars, craftsman's bars, that the defense provided to show that you can't distinguish these bars. There's nothing in there that can't do so. Miss Yeso was able to distinguish that at the trial and in fact she was able to do that at her position 30 years later that was taken by the plaintiffs in this case. She could still look at these four bars and say this is the one that I tested based upon the head of the bar, based upon what she could see, just physically looking at it, not without any chemical enhancement whatsoever. Without any identifying stuff otherwise? Without any identifying stuff. Here are the four bars. Yes. She was able to look at the head of that bar and see the same marks that she saw back in 1993 or 92 when she did her testing. So once again, knowing fabrication by Officer White simply has not been shown in this case. There's no constitutional violations if there's no knowing fabrication and no Brady claim. Based upon that, the city of Norwalk has no liability in this case. Shortly, I guess there's been some concern about whether or not the grand jury testimony should have been provided in this case. Clearly, the trial court, district court, looked at that, gave both parties the opportunity to point out to the district court what we thought might arise or be the information that might be helpful from that grand jury transcript. The judge gave the parties immense amount of discretion in what we wanted to tell him to look at. He then did so. I don't, as this court said, I can't see where there's any abuse of discretion with respect to that. Does the city of Norwalk have the grand jury materials? The city of Norwalk does not have the grand jury material. We were required to return that grand jury material to the state court. Had it for a while in your possession? Yes, it was within, it was The argument is it's fundamentally unfair, maybe a due process of a violation for one party to have grand jury material, but the other party not to have it. And there's a case that says that, I think. So why doesn't that establish that this is fundamentally unfair that you have it, but they do not? Douglas Oil says that it's not fundamentally unfair. Douglas Oil says that one party did in fact have the transcript and the other didn't. They said that was not enough to overcome the particular or to show a particular need. I think they got to show something. Am I right that the cases that do talk about this all involve criminal cases? Yes, you're corrected. But anyways, I thought federal grand jury material. And they are. They don't go back to state court material. You're right there. But I think they got to show some prejudice or that we were at some, that we obtained some advantage, the party having access to the transcript, obtained some advantage from that fact or there's some prejudice to them. And they, you know, other than a speculation, they haven't shown any of that. I just wonder if the burden is the opposite way that you have it and they don't and you might have to establish that, no, I didn't get an advantage of having this and my adversary did not have it. I'm not sure whose burden it is. Yeah, I agree with you, Judge. I'm not sure either, but I think it would be a difficult burden to show some advantage. In this particular case, am I not right that the case that the plaintiff is relying upon is one where the plaintiff had two options that they presented to the district judge. One was to turn it over. The other was to look at it in camera and see if there was anything that required it to be turned over. Yes, that's what the case says. That you are correct about that. And that's what the district judge did here. It is correct. And that's why we believe he did not abuse his do something to obtain these. They just sort of, you know, inadvertently were provided. How did you get the grand jury? The court reporter from the criminal trial inadvertently typed up the transcript, the grand jury transcript at the request back in 1981 and that transcript was placed with the evidence in the evidence room. So, in fact, when the plaintiffs and I went to the evidence room to look at what's what's still there, we both found the transcript. And so why didn't plaintiffs attorney? Because I wouldn't give it to him. So we took the transcript. I made a copy. We were going to provide it to him. And then the Sheeran County prosecutor said state court won't let you do that. Give it, give it back to us. State courts informed. Yeah. So and that's what we did. We we sent it back to him. Okay. All right. In sum, we don't think any constitutional violations were committed by Officer White and as such the city of Norwalk and Officer White were the court, the district court correctly gave us summary judgment. Thank you. All right. Any further questions? Nope. All right. We've got three minutes rebuttal. Ms. Hyatt. Regarding the motion to dismiss, while a complaint requires more than legal conclusions, likewise, the standard is not onerous. And in fact, if you look at Mills, our complaint had significantly more detailed factual allegations than in that case. And the Sixth Circuit found that that complaint, the fabrication claim survived. The in that case, the court described the complaint as saying that the manufacture and intentional misrepresentation of knowingly false inculpatory evidence by way of an inaccurate and untrue report of the defendant engaged in the manufacture intention. And that was enough. It's much more detailed here. So the court. What's certainly errant. What's more detailed here? The allegations that Yeso fabricated. What's, what's more, I mean, how is it more detailed? I mean, at best, you've got a close case. I mean, how is it much more detailed? In Mills, the complaint just alleged manufacture and intentional misrepresentation by way of an inaccurate report, essentially. And we said pretty much the same thing, but also said that she had this. Okay. Was it just that conclusory in Mills? Just, you know, that's what the court opinion indicated. I'm not familiar with the underlying complaint. Okay. But in addition, as to the motion to amend the complaint, while defendants argued that that should be applied under Rule 59 and 60, there clearly had been no judgment in this case. All of these decisions were interlocutory so long as some of the claims and defendants remained. So that still should have been considered under Rule 15 and should have been granted because it was not futile. Turning to Defendant White. There, the district court granted his motion for summary judgment in regard to the fabrication claim because it didn't, I believe there was a genuine dispute of fact regarding whether he knowingly turned over the breaker bar. However, the district court failed to apply the correct summary judgment standard when it made an inference in the defendant's favor that this had been the correct bar. The court suggested that it was reasonable to assume that they had discarded the two irrelevant bars and only kept the one relevant bar they believed had come from Jim Parsons. But that's disputed because not only is there no chain of custody documentation suggesting that, as White describes, there's only one bar in there so he took that one. There was no chain of custody showing that was the correct bar. And in fact, Neil Burris, who the bar was originally retrieved from, has testified that the bar that he saw in the grand jury wasn't the one that he gave them. So that factual dispute. Even if that's true, I mean, that two bars had just sort of disappeared or whatever. I mean, how does that lead to the conclusion that White knowingly gave the wrong bar? I wasn't responsible for this, for some of these bars disappearing. And maybe, you know, it could have been, even with what you just said, it could have been an honest mistake. Isn't that true? He knew that there wasn't any documentation. So he, at best, took a bar that he knew he could verify where it came from to create evidence that would tie it to Mr. Parsons. What about, well, okay, no, that's a fair answer. I thought White went to the evidence box. He finds this bar. It's in a bag. You complained that he throws the bag away, but he has an explanation for that. Is it not true that the bar that he had, regardless of how it got there, is a bar that happened to have the initials of the officers that confiscated the bar from the guy that bought the car? I know it did at one time, but at various points, it appears that those marks disappeared, and I'm not sure if there's any evidence of what was on it at the moment, other than White's testimony. But where is the evidence that White did something wrong with the bar? I mean, part of it is that this is still an issue. I know you've got a lot of theories here, but where is there any sort of evidence that he did something wrong with the bar? In combination with all of the other facts, there's as many moves as we can make, because it isn't just that he happened to do this in a situation that was otherwise not indicating that there was misconduct going on. There's evidence to support that he took it to Yezzo after taking it to other experts and not getting the connection that he wanted, because of her reputation. So combined with that, to take a bar... Excuse me, I'm trying to ask you a question. That's a different question, whether he's shopping this around to get expert testimony. We're focusing in on, did he knowingly produce a fake bar that he gave to somebody? And I'm just trying to figure out, what is the evidence of that? If he knew, he knew there wasn't any chain of custody documentation, he knew that there had been two bars previous, two craftsman bars, three bars total, and he had one craftsman bar. He doesn't know where it comes from. To take that and say, well, there's a 50-50 chance that this is the right one, and I'm going to take this and see what the evidence is, I would say does show that he knowingly took evidence that he couldn't verify where it came from, and the resulting evidence would be fabricated, essentially. Didn't it have a tag on it when he found it, Mr. Choka said, that indicated, you know, which bar it was and so on? That was, I'm trying to remember. There are a lot of bars and had various labeling at various times. I believe that was his testimony. It sounded, you know, I mean, that doesn't sound like a situation where the officer's being reckless in the way you're describing. Well, I think that's where the factual dispute becomes relevant. So we have White's testimony that I believe that you're right, that he said there was a tag on it. But then we also have Barissa's testimony that saw the bar that Yezo had done this analysis on in the grand jury and said that isn't the right one. So there's a dispute that needs to go to the jury and shouldn't have been resolved by the district court. But additionally, this is an important issue that the district court didn't address, even if the district court didn't err on these constitutional claims. The state law claims against White are subject to substantively different standards. The district court just dismissed the state law claims along with the federal claims and did not address them. But those standards are different. So for purposes of Ohio statutory immunity, that's a recklessness standard, not knowingly. You're out of time. Any further questions, Judge Keege, Judge Ketledge? Thank you very much for your argument. Thank you. Thank you for appearing. Case will be submitted.